**John D. HENSALA, Plaintiff,**

v.

**DEPARTMENT OF THE AIR FORCE, and F. Whitten Peters, Secretary of the Air Force, Defendants.**

**No. C00–01793 WHA.**

United States District Court, N.D. California.

May 25, 2001.

Richard DeNatale, Clyde J. Wadsworth, Christopher F. Stoll, Heller Ehrman White & McAuliffe, Stephen L. Collier, Tenderloin Housing Clinic, Inc., San Francisco, CA, for John D. Hensala, Plaintiff.

Vincent M. Garvey, Daniel Bensing, U.S. Department of Justice, Civil Division, Washington, DC, for Department of the Air Force, F. Whitten Peters, Secretary of the Air Force, defendants.

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

ALSUP, District Judge.

### INTRODUCTION

Under the Armed Forces Health Professions Scholarship Program, the United States pays for the medical education of participants on the condition that they then serve in the military. 10 U.S.C.

2120–27. When a participant does not complete the active-service requirement, the issue arises of whether he or she is required to repay the cost of the education to the United States. In this regard, the statute provides "that if such person, *voluntarily* or because of misconduct, fails to complete the period of active duty specified in the agreement ... such person will reimburse the United States in an amount that bears the same ratio to the total cost of advanced education provided such person." 10 U.S.C.2005(a)(3) (emphasis added). The statute further provides that when a person might owe a debt that is disputed, "the Secretary shall designate a member of the armed forces or a civilian employee under the jurisdiction of the Secretary to investigate the facts of the case and hear evidence presented by the person who may owe the debt and other parties, as appropriate, in order to determine the validity of the debt. That official shall report the official's findings and recommendations to the Secretary concerned." 10 U.S.C.2005(g)(1).

In this case, an investigating officer, the Secretary of the Air Force and subsequently an administrative review board all determined that plaintiff "voluntarily" failed to complete his active-service requirement. He was ordered to repay the cost of his medical education, $71,429.53. Judicial review is sought herein. After three rounds of briefing and two rounds of court-ordered discovery, the Court is convinced that summary judgment for defendants is required as a matter of law.

### STATEMENT

### Plaintiff's Education at Public Expense

Plaintiff John Hensala entered the Armed Forces Health Professions Scholarship Program on June 18, 1986, and was appointed to the grade of second lieutenant in the Air Force Reserve as a medical services corps officer. His contract provided that the Air Force could recoup the medical-education expense, "[i]f I fail to complete the period of active duty required by this agreement because of voluntary separation for any reason (e.g. conscientious objector, pregnancy, etc.) or involuntary separation because of substandard duty performance, misconduct (e.g.homosexuality)" (AR at 20). The contract required him to seek review of any recoupment determination by the Board for Correction of Military Records before requesting judicial review (AR at 17).[1]

From 1986 to 1990, plaintiff attended Northwestern University Medical School and actively served twenty weeks in the Air Force before graduating. According to him, during the course of his medical training he gradually became aware of his sexual orientation and told a few close friends he was gay in 1988. When he graduated Northwestern with an M.D. degree in 1990, he was appointed captain of the Air Force Reserve, Medical Corps. He deferred active duty while he completed a psychiatric residency at Yale University in 1993 and a fellowship in child psychiatry at the University of San Francisco in 1995.

### The "Don't Ask Don't Tell" Policy

On July 19, 1993, President Clinton promulgated a "don't ask don't tell" policy regarding sexual orientation and the military. On November 30, 1993, this policy was codified in the United States Code. It provided and still provides that once a

---

1. Citations to the AR refer to the initial administrative record that was filed with the Court. This record was supplemented pursuant to an order dated January 26, 2001. The supplemental administrative record is referred to as SAR.

service member admits to being gay, a rebuttable presumption arises that he or she engages in homosexual conduct. The person will be discharged for committing homosexual conduct unless he or she can "demonstrate that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." 10 U.S.C. 654(b)(2).

On May 17, 1994, Deputy Secretary of Defense John M. Deutch sent a memorandum to the secretaries of military departments, interpreting the recoupment statute, by then long on the books, in light of the new "don't ask don't tell" statute. The memo stated that some confusion existed over when recoupment was proper under the "don't ask, don't tell" policy, because the recoupment statute was passed when homosexuality alone was grounds for discharge. The memo discussed the differences in the statutes governing recoupment in various contexts, noting that some require recoupment as a matter of course, while others—such as the one at issue in this case—contain the language "voluntarily or because of misconduct."[2] The memorandum then came to the following conclusion:

> [A] member's statement that he or she is a homosexual, though grounds for separation under the current policy if it demonstrates a propensity or intent to engage in homosexual acts, does not constitute a basis for recoupment, as defined above. This does not preclude recoupment, however, if the member making such a statement has otherwise failed to complete his or her term of service 'voluntarily or because of misconduct.' In particular, recoupment would be appropriate where, based on the circumstances, it is determined that the member made the statement for the purpose of seeking separation.

This language means, both sides agree, that "recoupment may be pursued in cases involving statements of homosexuality when such statements are made for the purpose of obtaining separation" (AR at 34).

### Plaintiff's Violation of the "Don't Ask Don't Tell" Policy

By letter dated November 30, 1994, the Air Force notified plaintiff that he was required to complete a physical examination and that his active-duty obligation would begin in 1995. On December 12, 1994, plaintiff sent a letter to Colonel Daniel Degracias of the Directorate of Medical Service Officer Management. The letter declared (AR at 32):

> In light of recent policy changes concerning homosexuality on the part of the Air Force and other branches of the U.S. military, I have given the following matter substantial thought. I have decided that I should inform you, prior to beginning active duty service, that I am gay. I do not believe this will affect my ability to serve in the Air Force as a child psychiatrist, but in light of the recent change in policy, I think you should know this prior to my assuming an active duty assignment.

On April 4, 1995, plaintiff was ordered to report for active duty with the 375th Medical Operations Squadron, at Scott Air Force Base near St. Louis, Missouri on June 26, 1995.

In the Spring of 1995 (the record is unclear exactly when), the Air Force ap-

---

**2.** It noted that 37 U.S.C. 315(c)(1) "requires" recoupment of special pay for science and engineering officers; 37 U.S.C. 312(b) "permits" recoupment of special pay for nuclear- qualified officers; and 37 U.S.C. 302(f) requires recoupment of special pay for medical corps officers who "voluntarily" fail to complete their active-duty requirement.

pointed Major Albert Klein to act as plaintiff's counsel in connection with his declaration. On May 2, 1995, plaintiff submitted to Major Klein a list of organizations and people to confirm his sexual orientation. This list of references was forwarded to Colonel Rockne Buraglio, a reserve judge advocate, by Major Klein's paralegal assistant on June 14, 1995.

In the same period, plaintiff spoke by phone with Colonel Jay Weiss, Consultant to the Surgeon General for Psychiatric Affairs. Plaintiff inquired whether he could bring his boyfriend with him to Scott Air Force Base. Colonel Weiss purportedly told plaintiff that he could bring his boyfriend, but that he should not bring him into the housing office or publicize their relationship. Plaintiff's discharge letter stated that this conversation occurred between April of 1995 and May of 1995 (SAR at D81). In June of 1995, plaintiff's orders to report for duty were suspended.

### The Air Force Investigation and Decision

On August 4, 1995, Colonel J. Conley Meredith, the head of the legal office of the Air Reserve Personnel Center ("ARPC"), sent a letter to Colonel Frank P. Cyr, the commander of the ARPC, indicating that Colonel Buraglio had volunteered to be the investigating officer in plaintiff's case (SAR at D33). By letter dated August 9, 1995, Colonel Cyr officially appointed Colonel Buraglio to investigate into whether the Air Force would discharge plaintiff and seek recoupment (SAR at D31).

On August 22, 1996, Colonel Buraglio conducted a recorded interview of plaintiff, who was represented by counsel. During the interview, plaintiff stated the following. He realized that he was gay in 1988 and told a few close friends at the time (AR at 45). An attorney helped him write the letter declaring his sexual orientation that

he sent to Colonel Degracias in 1994 (AR at 37). At the time he wrote the letter, he knew that the Air Force had a "don't ask, don't tell" policy (AR at 38). Based on the advice of his counsel, some time in the Spring of 1995 he gave his attorney the list of people and organizations who could confirm that he was gay (ibid.).

In response to Colonel Buraglio's questioning, plaintiff gave the following account of his phone conversation with Colonel Weiss. Plaintiff told Colonel Weiss "I was homosexual and wanted to bring my boyfriend to Scott with me" (ibid.). Colonel Weiss replied "Okay, but don't bring him into the housing office" (ibid.). Plaintiff stated that around the time of this conversation (although whether it was before or after is unclear), his attorney explained the Air Force policy on homosexuality to him, but that he had not been briefed on the Air Force's policy before then, although he was generally aware of the "don't ask don't tell" policy from media reports (AR at 39–40).

Plaintiff told Colonel Buraglio during the interview that he did not know about the recoupment policy at the time he wrote the letter to Colonel Degracias or talked to Colonel Weiss, and it had no bearing on the statements he made to them (AR at 46). He stated that he first became aware that the Air Force could seek recoupment was in the Spring of 1995, after his conversation with Colonel Weiss (AR at 47).

When Colonel Buraglio asked him why he wrote the letter to Colonel Degracias, plaintiff stated that he had "reached a point where I was out, more open about my sexuality to my supervisors and co-workers, and did not feel that I could be in a situation where I wasn't able to be open with my co-workers about that important part of my life" (AR at 41). When asked about the timing of his letter, plaintiff

stated that he was concerned about "how I was going to be received" at Scott before he arrived (AR at 41–42) and that he had reached a point where "I was not comfortable hiding things from people, and I felt it was important to my mental health" (AR at 42).

At the end of the interview, the following colloquy occurred (AR at 48):

Q: Is there any other statement, offer of any information or any other evidence concerning this matter that you would like to present at this time?

A: For the record, I would just like to expand on my statement that I do want to serve in the Air Force to say that I always felt it would be a great population to work with.... So just to state that I have strong feelings about the military and would like to be a part of it.

Colonel Buraglio concluded that the Air Force should discharge plaintiff and seek recoupment because plaintiff declared his sexual orientation in order to avoid serving. On January 21, 1997, Colonel Buraglio wrote a letter to the ARPC stating his findings, recommendations, and reasoning (AR at 73–75). In the letter, Colonel Buraglio stated the following findings from the interview. Plaintiff "had given the matter substantial thought" before he informed Colonel Degracias that he was gay (AR at 73). "In the Spring of 1995, with orders to Scott AFB pending, Captain Hensala called Lt. Col. (Doctor) Jay Weiss ... and asked him if it was all right to bring his 'boyfriend' with him to his upcoming assignment at Scott AFB" (ibid.). Plaintiff provided a list of contacts confirming that he was gay (ibid.). Plaintiff made no attempt to rebut the presumption of homosexuality during his interview (AR at 74). Plaintiff indicated that he currently had a boyfriend (ibid.).

Colonel Buraglio found that there was "very strong evidence that Captain Hensa-la made the homosexual statement, hoping to trigger separation and avoid his active duty requirement" (ibid.). Colonel Buraglio based this conclusion on: (1) plaintiff made the declaration "within days of receiving his notice to schedule his active physical duty," (2) plaintiff submitted a list of organizations confirming that he was gay, and (3) plaintiff called his superior and said that he wanted to bring his boyfriend with him to Scott (ibid.). Colonel Buraglio found: "Contrary to what he professes, Captain Hensala did not want to fulfill his part of the 'professional education for professional service to the Air Force' bargain.... The aforesaid time line of significant events and the surrounding circumstances compels this conclusion" (AR at 74–75). He concluded: "Captain Hensala made the homosexual-orientation statement seeking separation and to avoid his duty obligation" (AR at 75).

On January 30, 1997, Colonel Meredith wrote to Colonel Cyr, forwarding Colonel Buraglio's report, and stating that the findings in the report constituted a legally sufficient basis for discharge and recoupment (Wadsworth Decl., Exh. A at 87–89). Colonel Cyr then closed the inquiry into plaintiff's declaration and ordered the ARPC legal office to begin the discharge process (SAR at D81). Colonel Cyr's order stated that he had received and reviewed Colonel Buraglio's report and that he had concluded that there was sufficient evidence for discharge and recoupment.

Plaintiff was told that the Air Force intended to discharge him on February 27, 1997. On May 15, 1997, he signed a "statement of selection of options" form, checking a box stating "I am not tendering my resignation" (AR at 54). The form explained that the Air Force could seek recoupment if he was "involuntarily discharged for homosexual conduct because [he] made a personal statement regarding

a propensity for homosexual conduct for the purpose of obtaining separation" (AR at 55). On the same day, by letter, he waived the opportunity to contest the Air Force's decision to discharge him and seek recoupment at an administrative proceeding. The letter stated that he "determined that such a proceeding is futile."

Based on Colonel Buraglio's letter and interview, the ARPC Legal Office recommended discharge and recoupment. On June 19, 1997, Colonel Meredith forwarded the ARPC Legal Office's conclusions to Colonel Cyr. The letter recited the key facts: plaintiff's letter to Colonel Degracias, his conversation with Colonel Weiss, his submission of the list of people and organizations to confirm his sexual orientation, and Colonel Buraglio's interview. Under the section labeled "Knowledge of DOD Homosexual–Conduct Policy," Colonel Meredith wrote (Wadsworth Decl., Exh. A at 52):

> Capt. Hensala claimed in his interview the first actual briefing he received on military homosexual conduct policy was in the Spring of 1995, after he had already made one or both of his statements about his orientation. This is inconsistent with his signed AFHPSP contract, which mentions homosexuality as an involuntary basis for discharge. If he completed security clearance application documents at the time of his entry, Capt. Hensala was also probably asked if he was homosexual. Capt. Hensala also admits to attending Air Force orientation and other military training sessions where the policy was almost certainly mentioned, although he denies receiving any such briefing. In any event, he admits to "the media" informing him of a change in the military's homosexual conduct policy, and that he knew, before making any of his

statements that the essence of the policy was "[Air Force] don't ask, [service members] don't tell."

(brackets in original).

On June 30, 1997, Colonel Cyr forwarded the case to the Air Force Personnel Council, recommending discharge and recoupment.[3] The Personnel Council voted unanimously for discharge and recoupment on October 21, 1997. Three days later, Colonel Cheryl Montgomery Harris, Director of the Air Force Personnel Council wrote to Joe Lineberger, Director, Air Force Review Boards Agency, Andrews Air Force Base. Director Lineberger was authorized to order discharge and recoupment on behalf of the Secretary of the Air Force. The letter recounted plaintiff's school and service history, his two declarations of his sexual orientation, his waiver of formal proceedings, that an inquiry officer performed an investigation and recommended discharge and recoupment, and that the ARPC's legal office and commanding officer recommended discharge and recoupment. It stated that plaintiff should be discharged and the Air Force should seek recoupment. It indicated that the Personnel Council relied on plaintiff's declarations, "along with other evidence in the case file" in finding that plaintiff "disclosed his homosexuality for the purpose of separating from the Air Force" ( Lineberger Decl., Exh. 1 at 2). The letter stated that the Personnel Council, "noted, in particular, [plaintiff's] voluntary decision to declare his homosexuality, the timing of that declaration, his age and [plaintiff's] awareness since 1988 that he is a homosexual" (*ibid.*). The letter indicated that the case file was being forwarded. On November, 5, 1997, the Secretary of the Air Force, acting through Director Lineberger, discharged plaintiff and ordered recoupment.

---

**3.** The letter is erroneously dated 30 June 1998

(Wadsworth Decl., Exh. A at 48).

### The Board for Correction of Military Records Appeal

On August 14, 1998, plaintiff petitioned the Air Force Board for Correction of Military Records ("AFBCMR") to rescind the recoupment order (but not the discharge). The AFBCMR requested that Colonel Meredith submit an advisory opinion stating the Air Force's position. The opinion was submitted on November 25, 1998. It surveyed the procedural history of the case and discussed the key facts in the administrative record: the letter to Colonel Degracias, the conversation with Colonel Weiss and Colonel Buraglio's interview (AR at 65–68). It explained that "under DOD policy, recoupment may be pursued in cases involving statements of homosexuality when such statements are made for the purpose of obtaining separation. Such statements are viewed as voluntary-separation statements" (AR at 70). Then it noted that: "Colonel Buraglio found that the applicant engaged in homosexual conduct that was a basis for discharge in an attempt to avoid recoupment" (*ibid.*). The opinion agreed with Colonel Buraglio's letter, adding, "[b]uttressing Colonel Buraglio's findings," it was significant that "even though the applicant had known of his homosexuality since the 'Fall of 1988,' he failed to disclose this fact until he had completed his medical education at government expense" (AR at 72). It then concluded that the evidence that Colonel Buraglio relied on was sufficient to find that plaintiff's separation was voluntary (*ibid.*).

The AFBCMR issued a written opinion denying plaintiff's petition on April 11, 2000. The opinion stated plaintiff's arguments and restated the following: plaintiff signed his contract in 1986, wrote the letter in 1994, was interviewed by Colonel Buraglio, was discharged for homosexual conduct, and was determined to owe the United States the cost of his education (AR at 3–5). It held, "we agree with [the] opinions and recommendations of the Air Force and adopt their [sic] rationale as the basis for the conclusion that the applicant has not been the victim of an error or injustice" (AR at 6).

### Proceedings Herein

After the AFBCMR made its determination, plaintiff filed suit herein on October 26, 2000. His amended complaint alleges that (1) defendants' decision to seek recoupment violated the Administrative Procedure Act, 5 U.S.C. 701–06; (2) despite its written policy, the Air Force always seeks recoupment when a person states that he or she is gay, and this alleged presumption violated plaintiff's Fifth Amendment rights to due process and equal protection; and (3) the recoupment determination violated his First Amendment right to freedom of speech. On November 17, 2000, defendants filed the present motion, which seeks either dismissal of the complaint or summary judgment.

On January 25, 2001, a hearing was held. At oral argument, it came out that the AFBCMR may have reviewed documents that were not included in the group of documents that was certified as the administrative record. In addition, it was unclear what the Secretary of the Air Force relied on to make the initial recoupment determination. On January 26, 2001, an order was issued requiring defendants to supplement the administrative record and to provide plaintiff with a list of all medical doctors and/or students separated from the Air Force since the date of the Deutch memo until the commencement of this action indicating, as to each, whether the Air Force sought, even temporarily, to seek recoupment, and the finding, if any, made as to voluntariness. That was done. The issues were rebriefed and reargued on April 12, 2001.

At the further hearing on April 12, defendants were further ordered to provide plaintiff with the files for three cases in which service members were discharged for declaring their homosexuality, without the Air Force seeking recoupment. Defendants filed redacted versions of the memoranda of decisions for these three cases, along with the declaration of Director Lineberger, which purported to summarize the contents of the three files. Plaintiff also filed a declaration regarding the contents of the three files. The parties were given the opportunity to argue their positions based on this discovery and have accordingly submitted supplemental briefs.

## ANALYSIS

This case does not present a question of whether the "don't ask don't tell" policy is constitutional. In *Holmes v. California Army National Guard*, 124 F.3d 1126 (9th Cir.1997), the Ninth Circuit upheld the policy, reasoning that it regulates conduct, not speech. The immediate issue rather is whether defendants' recoupment decision was lawful, *i.e.*, whether their finding that Dr. Hensala was "voluntarily" separated from the Air Force was supported by substantial evidence and whether his constitutional rights were violated with respect to the recoupment order. Under settled principles of administrative law, review of the Secretary's recoupment determination and AFBCMR's affirmance is necessarily limited to the information that they considered.

### APA Claim

 Defendants argue that decisions made by the AFBCMR are subject to a highly deferential standard of review. That argument has been clearly rejected by the Ninth Circuit. When the Ninth Circuit was called upon "to decide the extent of review, if any, by a federal court

over determinations of the Board [for Correction of Military Records]," it held, "that the Board action therefore may be set aside if arbitrary, capricious or an unlawful exercise of discretion." *Guerrero v. Stone*, 970 F.2d 626, 627 (9th Cir.1992) (citing 5 U.S.C. 702, 706(2)(A)). Accordingly, as to questions of fact, defendants' decisions will be reviewed for whether they were supported by substantial evidence in the record—that is, "whether on this record it would have been possible for a reasonable jury to reach the board's conclusion." *Allentown Mack Sales and Service, Inc. v. NLRB*, 522 U.S. 359, 366, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998).

There are two decisions needing review: the Secretary of the Air Force's initial determination to seek recoupment and AFBCMR's subsequent review of that decision. The AFBCMR explicitly stated the documents that it relied on (AR at 7). These were all the documents comprising the administrative record herein before the supplementation: plaintiff's health professional scholarship contract, the letter he sent to Colonel Degracias, a transcript of the interview with Colonel Buraglio, the letter from Colonel Buraglio detailing the findings from the interview, plaintiff's petition to the AFBCMR, his master personnel file, the advisory opinion from Colonel Meredith, and a letter from plaintiff's counsel. In making the initial recoupment decision, the Air Force relied on the documents in the original administrative record (excluding the arguments from plaintiff's counsel and the advisory opinion written by Colonel Meredith), and the supplemental materials submitted by defendants after the hearing on January 25: Colonel Buraglio's notes, the Guide to Inquiry Officers in Recoupment Dispute Cases, the list of people and organizations that could confirm plaintiff's sexual orientation, and various internal memoranda. Additionally, Di-

rector Lineberger considered the letter from Colonel Harris, dated October 24, 1997.

### "Voluntarily"

■ Defendants concede that they are not seeking recoupment on the ground that plaintiff committed "misconduct." Rather, they contend that he "voluntarily" failed "to complete the period of active duty" under 10 U.S.C. 2005. Both parties agree that the definition set forth in the Deutch memorandum was binding on the Air Force. Under this standard, separation from the service is voluntary when a person makes a statement for the purpose of obtaining separation. The Court agrees with this construction.

### Substantial Evidence

■ Substantial evidence supports both the Secretary's decision to seek recoupment and the AFBCMR's affirmance. From the record as it now exists, it is clear that the Secretary's initial decision to seek recoupment, like the AFBCMR decision, was based on Colonel Buraglio's investigation, interview, and report, plaintiff's service record, plaintiff's letter to Colonel Degracias, and the list of organizations submitted by plaintiff. This constitutes a sufficient evidentiary basis to support both decisions under the APA's limited standard of review. While it is disappointing that Colonel Buraglio neglected to ask, in the interview, a key question, *i.e.*, whether plaintiff knew at the time of his declarations that discharge would be a likely consequence, there is still substantial evidence supporting the conclusion that plaintiff made the declarations for the purpose of seeking separation.

Plaintiff first argues that since defendants never made any explicit credibility finding, his assertion to Colonel Buraglio that he wanted to serve in the Air Force must be accepted as true. When an agen-

cy makes a credibility determination, plaintiff argues, it must state a clear reason why in the record so that judicial review is possible. This contention rests on cases where administrative law judges failed to make explicit findings regarding credibility in either social security or immigration hearings. *E.g.*, *Hartooni v. INS*, 21 F.3d 336, 343 (9th Cir.1994) ("the ILJ must have a legitimate articulable basis to question petitioner's credibility, and must offer a specific, cogent reason for the stated disbelief. Absent an explicit finding that a specific statement by the petitioner is not credible we are required to accept her testimony as true.").

This argument fails. Even if the cited cases were applicable, Colonel Buraglio did make a credibility finding in his report, where he stated: "Contrary to what he professes, Captain Hensala did not want to fulfill his part of the ... bargain" (AR at 74). Further, Colonel Buraglio stated his reasoning: "The aforesaid time line of significant events and the surrounding circumstances compels this conclusion" (AR at 75). This finding was relied on by both the final decision-makers in this case: the Secretary and the AFBCMR.

Plaintiff next argues that Ninth Circuit law precludes a finding of intent solely based on the timing of one's acts. In *Tressan v. Laird*, 454 F.2d 761, 762–63 (9th Cir.1972), the Ninth Circuit held that timing of a statement was not by itself enough to establish intent. In *Tressan*, the plaintiff's application for conscientious objector status was rejected by the Navy. The evidence that the Navy primarily relied on was that Tressan submitted his application right before he was assigned to serve in Vietnam. After discrediting the Navy's other evidence, the court held that the timing of Tressan's application alone was insufficient to establish that his application was insincere. Unlike *Tressan*,

however, the timing of plaintiff's declaration was not the only evidence that defendants relied on. Defendants also considered his submission of the list of people who could document his homosexuality and his request to Colonel Weiss that he be allowed to bring his boyfriend to Scott. *Tressan* thus does not preclude defendants from considering that plaintiff publicized his sexual orientation six years after he discovered that he was gay and right before he was called to duty.

To be sure, the record admits of multiple interpretations. Plaintiff's counsel offers one plausible view. Plaintiff, it is argued, became aware of sexuality during school and gradually became more comfortable identifying as gay. He felt compelled, as a human and as a psychiatrist, to be honest about his sexual orientation. Although he revealed his sexual orientation shortly after the "don't ask don't tell" policy was implemented, he did not think, his lawyer says, that the policy would be upheld. Furthermore, the policy was new and nobody knew exactly how it would be implemented, and it seemed like the Air Force treated him like he would be allowed to serve openly.

The same record, however, supports defendants' interpretation. Plaintiff decided not to serve. He got a lawyer. With the benefit of legal advice, he made a declaration of his sexual orientation expected to fetch a discharge. For added measure, he submitted a list of organizations confirming his declaration and asked his commanding officer if he could bring his boyfriend to live with him. He knew these acts would be inflammatory because they affronted the Air Force's professed policy against homosexuality and violated the "don't ask don't tell" policy.

■ The Court's standard of review is limited. During the face-to-face interview with plaintiff, Colonel Buraglio was in the best position to judge plaintiff's credibility. Defendants, moreover, have expertise in determining when service members are trying to avoid their service obligations. Consequently, when more than one interpretation of the record is reasonable, as here, a court must defer to the agency's interpretation. *Arkansas v. Oklahoma,* 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992).

This case did not involve an isolated incident where plaintiff was discharged for confiding in a friend or being overheard saying that he was gay. Writing the letter, creating the list, and asking Colonel Weiss to bring his boyfriend to Scott were deliberate acts done over time with the benefit of legal advice. Since plaintiff had counsel, he presumably understood that the Air Force would follow its own rules and what the likely consequences of his acts would be. It is not unreasonable to infer that one intends the probable and foreseeable consequences of deliberate conduct. Accordingly, the Court finds that the Secretary of the Air Force's decision to seek recoupment and the AFBCMR's review thereof were supported by substantial evidence as required by the APA.

### Irrebuttable Presumption

■ A New York Times article dated June 1, 2000, quoted Air Force Spokesman, Major Chet Curtis, as saying "about 100 graduates of the Air Force's medical program were discharged from January 1996 to last July for being gay. All have been asked to repay the money and most are doing so." Focusing on the word "all," plaintiff claims that this statement and other evidence reveals that the Air Force does not follow the Deutch memorandum, but instead followed (and still follows) an undocumented policy. Under this alleged policy, any time a person states that he or she is gay, this creates an irrebuttable presumption that the statement was made

for the purpose of receiving a discharge. According to plaintiff, as applied to his case, this alleged presumption violated his rights to due process and equal protection.

Defendants contend that they make individualized determinations based on the facts of each case. In response to court-ordered discovery herein, defendants supplied a list of all medical doctors and/or students separated from the Air Force between the time the Deutch memo was written (May 17, 1994) and this action was commenced (October 26, 2000). The list states the reason for discharge, whether recoupment was sought, and whether the Secretary found that the separation was voluntary. The list shows that in cases where a service member made a "homosexual statement," recoupment was ordered 23 out of 28 times. In one of the cases, the Secretary ordered, then waived recoupment. In another, recoupment was not an issue. At most, this evidence shows that recoupment was ordered almost 90% of the time in cases where the discharge resulted from a homosexual statement. On its face, this statistical evidence shows that the Air Force did not always seek recoupment when a service member is discharged for declaring his or her sexual orientation. In fact, it shows that the Air Force sought recoupment less often in homosexual-statement cases than in other cases. Between January 1, 1996 and October 26, 2000, there were 322 cases where medical students participating in the scholarship program were discharged or resigned from the Air Force. In 27 of these cases, recoupment was not an issue. In 28 of these cases, separation occurred because of a homosexual statement. Out of the 277 cases that did not involve homosexual statements and where recoupment was an issue, recoupment was ordered 274 times, or almost 99% of the time.

The list produced by defendants, however, failed to explain what happened in the three cases where the Air Force did not seek recoupment, and whether the standard in the Deutch memo was actually applied. As a result, defendants were further required to produce the memoranda of decisions from these cases, plaintiff was allowed to view the confidential files of these three former service members, and both sides submitted declarations purporting to summarize these files (done in this manner to protect the privacy of the subjects).

In the first such case, the service member served on active duty for about two years, and then deferred her remaining active duty commitment to attend a medical residency. During her residency, she sent a letter to Air Force Personnel Management Center stating that she was homosexual. The Air Force then initiated discharge proceedings. At a discharge proceeding, she stated that she discovered her sexual orientation during her residency and that she wanted to complete her service commitment. The Personnel Board recommended an honorable discharge and recoupment. A few days after this recommendation, however, the Deutch memo was issued. Based on the record, the Personnel Board concluded that recoupment was not appropriate. The memo of decision read:

> Members of the Board are always suspicious when a respondent states "the right thing" to avoid a service commitment in order to enter a lucrative profession and to avoid recoupment. Nevertheless, suspicion is not evidence of making a statement for the purpose of seeking separation. Moreover, the case file displays several endorsements of this respondent's conscientious service while on active duty; statements by active duty officers attesting to her good

character and, presumably truthfulness; and her willingness to serve if allowed. No recoupment was ordered.

In the second case, during his fellowship, and after more than five years of active duty, a service member's wife divorced him after discovering he was gay. He began dating a man, but the relationship fizzled. The service member became depressed and tried to withdraw from his medical fellowship. The Air Force, however, convinced him to get professional help for his depression. In filling out a form asking why he required counseling, he stated that he was a homosexual. When he was told that this statement was not privileged, he stated that "homosexuality was central to his emotional state and that if he omitted references to his sexual orientation, therapy would be ineffective." During a subsequent interview with an inquiry officer, the service member admitted making the statement, but stated that he wanted to complete his service commitment. He refused to answer questions regarding his sexual relationships. When he was told that the Air Force was considering discharging him, he resigned. With his resignation, he submitted three letters about his good service and character. The Air Education and Training Command found that there was no basis for recoupment. When the case was submitted to the Personnel Board, the Board found that he made the statement for purposes of seeking medical treatment and not to avoid his service commitment. The Air Force did not seek recoupment.

In the third case, the service member had served four years of active duty, but none of his service commitment under the Health Professions Scholarship Program. When he was in the third year of his residency, someone sent an anonymous email to his commanding officer stating that he was a homosexual. After the Air Force began investigating as to whether discharge was appropriate, the service member sent a letter to the Personnel Council, stating that he was gay. During an interview by an inquiry officer, the service member admitted that he wrote the letter. The inquiry officer recommended recoupment on two bases: 10 U.S.C. 2005 and paragraph 10 of his HPSP contract, which authorized recoupment if he failed to complete his active-duty service commitment. At a subsequent discharge proceeding, the service member explained that the person who wrote the email was at one time his friend. He stated that the email contained lies about him, that he wrote the letter "because he wanted the Air Force to hear the truth," that the email gave him no choice but to write the letter, and that he hoped that by writing the letter he would be allowed to continue serving. He called a doctor to testify on his behalf, and submitted 19 written exhibits. The discharge board concluded that he should be discharged and that although he "did not make a statement of homosexuality voluntarily, for the purpose of seeking separation," the Air Force should seek recoupment based on his HPSP contract. The Personnel Council agreed. Based on these findings, however, Director Lineberger concluded "that the member's statement was not voluntary within the meaning of the Deutch Memorandum" and directed that the member be discharged without recoupment (Lineberger Supp. Decl. ¶ 5).

These cases all confirm what defendants have maintained from the outset of this litigation—that in recoupment cases, the Air Force makes an individualized determination based on the facts surrounding a service member's statement of sexual orientation. Unlike plaintiff, in addition to their statements that they wanted to serve, each of these service members submitted evidence for the Air Force to consider, such as testimony from others and

their service records. Two of them opted for administrative hearings. In all of these cases, based on the facts developed, the decision-makers concluded that the statements were not made for the purpose of seeking separation. In all of these cases, no recoupment was ordered based on the standard set forth in the Deutch memo. These cases convincingly refute plaintiff's allegation that defendants apply an irrebuttable presumption.

Plaintiff next argues that one of Colonel Meredith's letters demonstrates that the Air Force applied an irrebuttable presumption. The key excerpt plaintiff relies on read: "just as we presume that only a person with a death wish actually seriously attempts suicide, it is appropriate to infer that a knowledgeable service member would only make a statement of homosexuality, then refuse to recant from it, if they seriously expected, if not wanted, to be discharged." This excerpt, however, does not establish that the Air Force applied an irrebuttable presumption. From the record, it is apparent that the investigation into plaintiff's case was done by Colonel Buraglio. It is unclear whether Colonel Meredith's letter, much less the passage above, was given any consideration by the decision-makers in plaintiff's case. Colonel Meredith's letter was written to Colonel Cyr. When Colonel Cyr recommended recoupment to the Personnel Council, he did not mention Colonel Meredith's letter or include this argument. Rather, Colonel Cyr recommended recoupment because plaintiff was aware of the consequences of his actions through his AFHPSP contract, plaintiff had the advice of an attorney when he wrote the letter to Colonel Degracias, and the timing of events suggested plaintiff's separation was voluntary (Wadsworth Decl., Exh. A at 48). While Colonel Meredith's letter may have been in the case file reviewed by the Personnel Council and Director Lineberger, and was reviewed by the AFBCMR (included in plaintiff's personnel records), no decision-maker ever purported to rely on it. And, the words used in the letter do not actually purport to state an irrebuttable presumption to be applied across the board in all homosexual-statement cases, regardless of varying fact patterns. In context, it is clear that this passage was addressing a fact pattern in which a service member understood that he or she would be discharged for making a declaration, then made one anyway. The rest of the letter offered four pages of facts and analysis supporting the recoupment decision in plaintiff's case.

Last, plaintiff claims that the Guide to Inquiry Officers in Recoupment Dispute Cases ("Recoupment Guide") created an irrebuttable presumption. Plaintiff challenges the following instruction (SAR at A27):

your concern as an investigator will be to determine if a factual basis for voluntariness exists. 'Voluntariness,' for the purpose of meeting the criteria of 10 U.S.C. 2005(a)(3), may be considered to include not only direct evidence suggesting a desire to separate from the Air Force, but also evidence that the member took actions they knew would or could have the natural consequence of causing their separation from the Air Force. As a result, evidence that the member knew what the DOD and Air Force policy on homosexual conduct was before they made a statement of homosexuality may be as relevant as evidence of voluntariness as is evidence that the member submitted their resignation or requested discharge. Another key factual consideration may be the timing of when (in homosexual statement and misconduct cases) the conduct occurs....

This passage, read as a whole, shows that investigating officers were instructed to consider knowledge of the "don't ask don't

tell" policy as an important piece of evidence, not as conclusively determinative. Obviously, if someone were unaware of the policy, it would be less likely that his or her declaration was motivated by a desire to offend the policy and thereby fetch a discharge. The converse is true. Knowledge of the policy is a consideration in whether or not the actor was trying to manipulate a discharge. This consideration is reasonable.

Plaintiff also points to a portion of the Recoupment Guide that anticipated arguments members disputing recoupment might make. Under "I am willing and believe I am able to serve as I promised; only the Air Force disagrees," it read, "Air Force contracts are very specific about the Air Force having to be satisfied as to the member's physical condition or propensity for homosexual conduct. Therefore, this argument is not relevant" (SAR at A28). As shown by the decisions in which no recoupment was ordered, this guidance did not create an irrebuttable presumption, because it did not preclude an investigating officer from considering evidence besides the service member's assertion that he or she was willing to serve. While this passage shows that the Air Force viewed with suspicion self-serving statements, including those made by persons discharged for failing the physical-condition requirement, it does not show that a special irrebuttable presumption was applied in homosexual-statement cases. The Air Force practice was explained in the memorandum of decision for one of the cases in which no recoupment was ordered: "Members of the Board are always suspicious when a respondent says 'the right thing' to avoid a service commitment in order to enter into a lucrative profession. Nevertheless, suspicion is not evidence of making a statement for the purpose of seeking separation." This policy did not create an irrebuttable presumption.

\*　　\*　　\*　　\*　　\*　　\*

■ Despite two rounds of discovery, plaintiff still seeks yet more discovery into all the other homosexual-statement cases in which the Air Force ordered recoupment. In administrative review cases, "[n]ormally there must be a strong showing of bad faith or improper behavior" before a court allows discovery. *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1437 (9th Cir.1988) (brackets in original, quotation omitted). In constitutional claims against an agency, a court must balance the plaintiff's need for access to proof against the burden this will impose on the government and privacy concerns. *See Webster v. Doe,* 486 U.S. 592, 604, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *see also Exxon Shipping Company v. United States Department of the Interior,* 34 F.3d 774, 779–80 (9th Cir.1994).

Plaintiff cites *Cooper v. Caldera,* 96 F.Supp.2d 1160 (D.Kan.2000), *Cobb v. Danzig,* 190 F.R.D. 564 (S.D.Cal.1999), and *Simmons v. Marsh,* 564 F.Supp. 379 (D.D.C.1983), as supporting his request for more discovery. In *Cooper,* the plaintiff alleged that her right to due process was violated when the Army Board for Correction of Military Records considered extra-judicial evidence that she was not allowed to rebut. The court denied summary judgment since it was unknown what evidence the AFBCMR considered. In *Danzig,* the plaintiff alleged that she was denied a security clearance based on discrimination. A magistrate allowed the plaintiff to take one deposition limited to four topics. In *Marsh,* the plaintiff challenged the AFBCMR's refusal to expunge items from his Army record and was allowed "some discovery to allow him to discover what procedures the AFBCMR followed in processing his case." 564 F.Supp. at 380.

■ None of these cases entitles plaintiff to further discovery. Plaintiff has not

made a showing that defendants acted in bad faith or employed irregular procedures. From the supplemented record, it is clear what evidence the decision-makers in his case considered. The Court has ordered two rounds of discovery surgically directed at determining the accuracy of plaintiff's allegation that an irrebuttable presumption was applied in his case. In light of the evidence shown, this allegation has no merit. Yet more discovery into the 24 cases in which recoupment was ordered—evidently to search for conclusive-presumption language—where there is no reason to expect such evidence would be, at this stage, simply a last-ditch fishing expedition. The burden of such incremental discovery outweighs any realistic chance it would turn up probative evidence. The request for additional discovery will be denied. Defendants are entitled to summary judgment on the "irrebuttable presumption" claim.

**Equal Protection and First Amendment**

■ Plaintiff's second argument based on the Equal Protection Clause and argument based on the First Amendment are foreclosed by the Ninth Circuit's decision in *Holmes*. Plaintiff argues that because "defendants do not seek recoupment from those heterosexual service members who are discharged for their propensity to engage in prohibited sexual activity," yet seek recoupment from homosexual service members who make such statements, that this violates the Equal Protection Clause (First Supp. Br. at 5). It is true that homosexual and heterosexual service members are treated entirely differently in this respect. Heterosexual service members are not discharged for making statements indicating a propensity to engage in prohibited sexual conduct, and therefore the Air Force does not seek recoupment on that basis. The source of this difference is the "don't ask don't tell" policy, which has already been upheld by the Ninth Circuit.

The Court is constrained to follow *Holmes*, even though plaintiff's equal-protection claim is styled as a challenge to the policy of seeking recoupment rather than the policy of seeking discharge. For the same reason, plaintiff's argument that defendants violated the First Amendment because they sought recoupment based on his declaration that he was gay is also rejected.

### CONCLUSION

Substantial evidence supports both the Secretary's decision to recoup the costs of plaintiff's medical education, and AFBCMR's affirmance of that decision. Because plaintiff has offered no evidence that his constitutional rights were violated, defendants' motion for summary judgment on all of plaintiff's claims is GRANTED. The Clerk shall close the file.

**IT IS SO ORDERED.**